JDN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Hector Lopez, | No.  CV 13-00691-TUC-DCB |
| Plaintiff, |  |
| vs. | **ORDER** |
| CO II Bollweg, et al., |  |
| Defendants. |  |

Plaintiff Hector Lopez, through counsel, brought this civil rights action under 42 U.S.C. § 1983 against Arizona Department of Corrections (ADC) Sergeant J. Bennett, Correctional Officer (CO) Suarez, and Lieutenant P. Swaney.  (Doc. 35.)  Plaintiff alleged that Defendants violated his right to constitutionally adequate medical care.  (*Id.*) Before the Court is Defendants' second Motion for Summary Judgment, which Plaintiff opposes.  (Docs. 108, 121.)

The Court will grant the Motion in part and deny it in part.

## I.    Background

In his First Amended Complaint, Plaintiff alleged that on or around July 20, 2012, he and three other inmates consumed botulism-contaminated food.  (Doc. 35 ¶¶ 13–14, 16.)  He claimed that all four inmates fell ill, and one inmate was admitted to the hospital for botulism poisoning.  (*Id.* ¶¶ 17, 23.)[1]  Plaintiff alleged that from July 25–August 2,

---

[1] According to the Centers for Disease Control and Prevention (CDC), botulism is a rare but serious illness caused by a toxin that attacks the body's nerves, causing weakness of muscles that control the face and throat, and this weakness may spread to the

2012, his condition deteriorated, and he experienced general weakness and difficulty breathing, chewing, swallowing, eating, walking, and speaking.  (*Id.* ¶¶ 18, 24, 27.) According to Plaintiff, he was taken to the hospital for treatment on August 2, 2012, only after he lied and said that he had consumed hooch.  (*Id.* ¶¶ 47–49.)  Plaintiff alleged that Defendants acted with deliberate indifference because they were aware of his condition, but failed to ensure medical treatment.  (*Id.* ¶¶ 34, 37–38, 43–45, 76–77, 81, 84.)

Defendants previously moved for summary judgment on qualified immunity grounds.  (Doc. 40.)  The Court determined that Plaintiff established that the right at issue was clearly established; however, as to whether Defendants reasonably believed their conduct was lawful, the factual record was insufficient.  (Doc. 64 at 10–11.)  The Court therefore found that it was premature to resolve the qualified immunity issue.  (*Id.* at 11.)

Defendants now move for summary judgment a second time, arguing that they did not act with deliberate indifference to Plaintiff's serious medical need and they are entitled to qualified immunity.  (Doc. 108.)

## II.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d

---

rest of the body, including to muscles that control breathing, which can lead to difficulty breathing and death.  *See* https://www.cdc.gov/botulism/index.html (last visited June 9, 2017); *see also Holifield v. UNUM Life Ins. Co. of Am.*, 640 F. Supp. 2d 1224, 1234 n.8 (C.D. Cal. 2009) (finding it appropriate to take judicial notice of materials and publications from the CDC website); *Paralyzed Veterans of Am. v. McPherson*, No. C 06-4670 SBA, 2008 WL 4183981, at *5 (N.D. Cal. Sept. 9, 2008) (government agency websites are often treated as proper subjects for judicial notice) (citing cases).

1099, 1102–03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor.  *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  The court need consider only the cited materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

## III.   Relevant Facts

At the relevant time, Plaintiff was housed in the Special Management Unit (SMU), a maximum custody unit.  (Doc. 106, Defs.' Statement of Facts ¶ 6.)  In the SMU, inmate movement is strictly controlled; inmates cannot come and go as they please.  (*Id.*, Ex. C, Bennett Decl. ¶ 25.)  Inmates are put in restraints and escorted by COs to medical for treatment as appropriate.  (*Id.* ¶ 26.)  Correctional officers can also summon medical assistance for inmates in need of medical attention, such as when they observe an inmate who is non-responsive or in a medical crisis, by initiating an Incident Command System (ICS).  (*Id.* ¶ 27.)  Nursing staff visit the cell areas to deliver medication to inmates several times a day, and they visit cell fronts in response to Health Needs Requests

1    (HNRs) that prisoners have submitted.  (*Id.* ¶ 25.)  When a nurse is in the housing area

2    delivering medications or seeing inmates, he or she is accompanied by a CO.  (*Id.*)

3            On or about Friday, July 20, 2012, Plaintiff and three other inmates—Thomas

4    Granillo, Enrique Montijo, and Robert Aceves—shared food, and they all began to feel ill

5    over the next few days.  (Doc. 35 ¶¶ 13, 17.)

6            On or about July 25, 2012, Granillo was taken to the hospital.  (*Id.* ¶ 23.)

7            By July 25, 2012, Plaintiff and his cellmate, Montijo, were complaining about

8    their symptoms to every CO that passed by their cell.  (Doc. 63, Pl. Decl. ¶ 17.)  At the

9    time, Plaintiff's symptoms included blurry vision, dizziness, extreme fatigue, drowsiness,

10   throat tightness, a numb tongue, constant headache, stomach/neck/back pain, and a

11   general feeling of being "drugged."  (*Id.* ¶ 18.)  As his condition deteriorated, Plaintiff

12   was unable to control his body; he was unable to walk, eat, or drink.  (*Id.* ¶ 19.)

13           By Friday, July 27, 2012, Plaintiff could barely open his eyelids, he could not

14   walk straight, and his meals were collected uneaten.  (*Id.* ¶¶ 20–23.)  That night, shortly

15   after midnight, a CO escorted Plaintiff to the medical unit.  (*Id.* ¶ 24.)  Plaintiff told the

16   nurse that he had not taken drugs or alcohol, and he took a urinalysis test, which came

17   back negative for drugs or alcohol.  (*Id.* ¶¶ 27–29.)[2]  The nurse told Plaintiff that there

18   were no graveyard or weekend doctors, so the earliest he could see a doctor for diagnosis

19   was Monday, July 30, 2012.  (*Id.* ¶ 30.)  Nurses were prohibited from making any

20   assessment or diagnosis because they are not qualified to make such conclusions.  (Doc.

21   122, Pl.'s Statement of Fact ¶ 19.)[3]  Plaintiff was returned to his cell without treatment.

22   (Doc. 63, Pl.'s Decl. ¶ 34.)

---

24   [2] Defendants object to the reference to a urinalysis test on the ground that the
     factual assertion lacks foundation.  (Doc. 124 at 4.)  Defendants' objection is overruled.

25   Plaintiff's states in his sworn declaration that he took a urinalysis test, and he has
     personal knowledge of this fact.  *See* Fed. R. Civ. P. 56(c)(4).

26
     [3] Defendants object to Plaintiff's Statement of Fact ¶ 19 on the ground that the

27   statement and supporting evidence are irrelevant.  (Doc. 124 at 3.)  Defendants' objection
     is overruled. The Court finds that the factual assertion that nurses were not qualified to

28   make any assessment or diagnosis is supported by declaration evidence, and this fact is
     relevant in light of Defendants' argument that they could not have been aware of a

On July 29, 2012, Plaintiff's symptoms escalated; he was unable to breathe without struggling and he was unable to chew, talk clearly, walk, or otherwise function properly.  (*Id.* ¶ 37.)  Plaintiff's tongue and lips were effectively paralyzed and he was gasping for breath.  (*Id.* ¶ 39.)  Plaintiff and his cellmate called over a CO, who then initiated an ICS.  (*Id.* ¶¶ 40–41.)  In the SMU, COs never opened cells without first cuffing inmates; however, when staff responded to the ICS, they did not bother to handcuff either Plaintiff or Montijo.  (*Id.* ¶¶ 42–44.)  Plaintiff was placed on a gurney and taken to the medical unit; however, medical simply checked his vitals and then sent him back to his cell.  (*Id.* ¶¶ 46–48.)

The next day, July 30, 2012, Suarez came by Plaintiff and Montijo's cell, and Montijo told Suarez that he and Plaintiff had whatever Granillo had but no one would let them see a doctor.  (*Id.* ¶¶ 53, 61, 62.)  Suarez promised to arrange a visit to medical, but then he returned and told them that no one at medical wanted to see them.  (*Id.* ¶¶ 63, 66.)  Plaintiff and Montijo begged Suarez to activate an ICS, but he did not do so.  (*Id.* ¶ 67.)

Around this time, Plaintiff was convinced that he was going to die, and he wrote a letter to his mother telling her he was going to die.  (*Id.* ¶ 68; Doc. 106, Ex. G, Pl. Dep. 149:9–14, Aug. 23, 2016.)[4]

Also, around this time, COs began telling Plaintiff and Montijo that they would not get treatment unless they said what made them "drugged," and one CO told them to admit to drinking hooch or other contraband if they wanted treatment. (Doc. 63, Pl. Decl. ¶¶ 69–70.)

The next day, July 31, 2012, Bennett came to Plaintiff and Montijo's cell.  (*Id.* ¶¶ 81, 92.)  By this time, Plaintiff was in constant, visible agony.  (*Id.* ¶ 101.)  Montijo begged Bennett to get them to a doctor; Montijo told Bennett that the nurses refused to

---

serious medical need because Plaintiff was not diagnosed with botulism until August 2, 2012.  (*See* Doc. 106, Ex. F, Salyer Decl. ¶ 13; Doc. 108 at 7–8.)

[4] To the extent that Defendants object to the reference to Plaintiff's letter to his family, the objection is overruled.  (Doc. 124 at 3.)  Plaintiff has personal knowledge of the fact that he wrote the letter and what he stated in the letter.  *See* Fed. R. Civ. P. 56(c)(4).

help or examine them and they needed to see a doctor to get a diagnosis.  (*Id.* ¶ 95.)  Plaintiff tried to tell Bennett that he was dying, but it was difficult for Bennett to understand him.  (*Id.* ¶ 96.)  Bennett promised to get them to a doctor; however, he later returned to the cell and told them that no one wanted to help them, and Bennett did not activate an ICS.  (*Id.* ¶¶ 98–100.)

On August 1, 2012, Montijo began choking, and inmates in the pod started screaming "man down!" to get attention.  (*Id.* ¶ 102.)[5]  Swaney and other officers arrived.  (*Id.* ¶ 103.)  Swaney looked at Montijo and Plaintiff and shouted words to the effect "I can't do anything for you.  Medical doesn't want to help you!"  (*Id.* ¶ 104.)  When Montijo begged to speak to Sawney's supervisor or doctor, Swaney yelled "no," shook a can of pepper spray at Montijo and Plaintiff, and threatened to pepper spray them if they kept asking for medical help.  (*Id.* ¶ 105.)  As Swaney left, other inmates in the pod pleaded for Swaney to help Plaintiff, Montijo, and Aceves, and Swaney responded by yelling "suck my dick," "shut the fuck up," and "they don't have shit coming."  (*Id.* ¶¶ 109–110.)  Swaney states that he yelled at the inmates to "shut the fuck up" in order to get the inmates' attention and make his presence known; however, he denies yelling "they don't have shit coming." (Doc. 106, Ex. J, Swaney Dep. 54:7–9, 55:1–12, May 19, 2016.)  Swaney did not activate an ICS.  (Doc. 63, Pl. Decl. ¶ 111.)

The parties dispute what transpired on August 2, 2012.  Plaintiff states that Swaney came to his cell and said that unless one of the inmates confessed to using hooch, they could not see a doctor.  (*Id.* ¶¶ 112–113.)  Plaintiff indicated that he used hooch.  (*Id.* ¶ 114.)  Swaney said that he would write Plaintiff a disciplinary ticket, and then he made sure that Plaintiff, Montijo, and Aceves were taken to the medical unit.  (*Id.* ¶¶ 115–116.)

---

[5] Defendants object to the factual assertion that inmates in the pod were yelling "man down!" absent any evidence that any Defendant was aware of the inmates' calls.  (Doc. 124 at 5.)  The objection is overruled.  The Court finds the factual assertion relevant, and Swaney testifies that inmates in the pod were yelling and he tried to get the inmates' attention; thus, he was aware of the yelling.  (Doc. 106, Ex. J, Swaney Dep. 55:1–12, 62:20–24.)

When Plaintiff got to medical, the doctor immediately diagnosed botulism, and Plaintiff was sent to the hospital.  (*Id.* ¶ 119.)

Swaney states that on August 2, 2012, he was directed by the Deputy Warden to have Plaintiff and the other two sick inmates brought to medical.  (Doc. 106, Ex. J, Swaney Dep. 11:4–6, 56:11–57:1.)  When the inmates arrived at the medical unit, they were placed in separate, individual rooms to be seen by the doctor.  (*Id.*, Ex. E, Swaney Decl. ¶¶ 37–38.)  Swaney avers that he interviewed each of the inmates individually either before or after the doctor evaluated them.  (*Id.* ¶ 39.)  Swaney states that Plaintiff admitted to consuming hooch during the interview.  (*Id.* ¶ 40.)  Swaney denies that he coerced Plaintiff into admitting that he had consumed hooch as a condition of receiving treatment or going to the hospital.  (*Id.* ¶ 41.)  Swaney states that the doctor made the medical decision to send Plaintiff and the other two inmates to the hospital, and Swaney coordinated the logistics for transport.  (*Id.* ¶ 42.)

Plaintiff was hospitalized for seven days.  (Doc. 35 ¶ 49.)

## IV.   Governing Standard

Under the Eighth Amendment standard, a prisoner must demonstrate "deliberate indifference to serious medical needs."  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard.  First, a prisoner must show a "serious medical need."  *Jett*, 439 F.3d at 1096 (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).  Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that

significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. An official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A plaintiff may rely on "circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." *Lolli v. Cnty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment," *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted), or when they fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "[A] prisoner need not prove that he was completely denied medical care in order to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (quotation omitted), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). Further, if prison officials "choos[e] to rely upon a medical opinion which a reasonable person would likely determine to be inferior," their actions may amount "to the denial of medical treatment[] and the 'unnecessary and wanton infliction of pain.'" *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992) *overruled in part on other grounds as recognized in Snow*, 681 F.3d at 986.

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

. . . .

. . . .

## V.     Discussion

### A.     Serious Medical Need

Defendants do not directly address this first prong of the deliberate indifference analysis; however, they acknowledge that "in hindsight, [Plaintiff] was suffering from a serious medical condition during the relevant time."  (Doc. 108 at 8.)  The Court finds that in light of Plaintiff's allegations of severe and progressively worsening symptoms, including difficulty breathing, and his botulism diagnosis, which required a seven-day hospital stay, a reasonable jury could find that Plaintiff suffered a serious medical need. *See McGuckin*, 974 F.2d at 1059–60.

### B.     Deliberate Indifference

The Court therefore turns to the subjective prong of the deliberate-indifference analysis, which requires Plaintiff to show that Defendants' responses to his serious medical need were deliberately indifferent.  *Jett*, 439 F.3d at 1096.  The Court must look at "whether [each] individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

#### 1.     Bennett

The initial inquiry in the subjective prong analysis is whether Bennett was aware of Plaintiff's serious medical need.  Defendants argue that because they did not know at the time that Plaintiff had botulism, they could not have known that he had a serious medical need.  (Doc. 108 at 8.)  They further argue that Plaintiff's symptoms were not readily observable, and even the nurses could not identify anything wrong with him.  (*Id.* at 8–9.)

Knowledge of a specific diagnosis is not required for a prison official to be aware of a risk of serious harm.  Moreover, the record shows that nurses could not make an assessment or diagnosis; thus, Plaintiff could not get any diagnosis until he saw a doctor, which he alleges Defendants prevented.  (Doc. 106, Ex. F, Salyer Decl. ¶ 16.)

Regarding Plaintiff's observable symptoms, Bennett avers that when he spoke to Plaintiff, Plaintiff described general symptoms that, to him, sounded like the flu, and Bennett did not observe any physical symptoms that he associated with serious illness. (Doc. 106, Ex. C, Bennett Decl. ¶ 31 (Doc. 106-1 at 30).)  According to Bennett, due to the small size of Plaintiff's cell, he could not notice if Plaintiff had mobility or balance problems.  (*Id.*)  Bennett states that because he did not observe Plaintiff displaying symptoms he believed required immediate attention, he did not initiate an ICS.  (*Id.* ¶ 32.)

Plaintiff avers that, by July, 31, 2012, when he spoke to Bennett, he was unable to control his body and unable to walk or eat; he could barely open his eyelids; he could not chew, talk clearly, or otherwise function properly; and he was unable to breathe without struggling and gasping for breath.  (Doc. 63, Pl. Decl. ¶¶ 17–19, 21–23, 37, 81, 92–93.)  These are all observable symptoms.  Also, Plaintiff avers that on July 31, 2012, Bennett saw him "barely able to move."  (*Id.* ¶¶ 92–93.)  And in his deposition, Plaintiff states that when he asked Bennett for help that day, Bennett replied that "you guys look bad," "you guys look really sick.  You guys need help."  (Doc. 106, Ex. G, Pl. Dep. 134:15–135:2, Aug. 23, 2016.)

Plaintiff notes that on July 29, 2012, when officers responded to an ICS and appeared at his cell, staff videotaped the incident, and this videotape would show his condition and that he was in need of emergency medical treatment.  (Doc. 63, Pl. Decl. ¶¶ 42, 45.)  Such evidence could be conclusive as to Plaintiff's objective appearance; however, no videotape was submitted.[6]  *See Scott v. Harris*, 550 U.S 372, 380–81 (2007) (where the nonmovant's version of facts was blatantly contradicted by a videotape, the court should have viewed the facts in the light depicted by the videotape when ruling on summary judgment).  Therefore, the Court must take as true Plaintiff's averments regarding his observable symptoms.  Other courts have recognized that difficulty

---

[6] Plaintiff states that defense counsel informed him that they do not have a copy of the video.  (Doc. 121 at 8 n.5.)  If necessary, the parties may raise spoliation-of-evidence issues in pretrial motions.

breathing constitutes a life threatening emergency.  *See, e.g.*, *Culler v. San Quentin Med. Servs.*, No. C 13-03871 BLF (PR), 2015 WL 1205086, at *4 (N.D. Cal. March 16, 2015) (undisputed that certain medical responses were reserved "only for emergencies, such as when an inmate has fallen and is unable to get up, appears to have difficulty breathing, is having chest pains or a seizure, or any other life threatening emergency"); *Jeffries v. Sullivan*, No. 3:06cv344/MCR/MD, 2008 WL 703818, at *16 (N.D. Fla. March 12, 2008) (where the plaintiff was short of breath, unable to talk without gasping for air, and required special posturing (arms raised overhead) in order to breathe, a factfinder could deduce that the defendant recognized the plaintiff had a serious medical need).

Believing Plaintiff's allegations regarding his condition, a jury could find that Defendants knew of Plaintiff's serious medical need from the fact that it was obvious. *See Farmer*, 511 U.S. at 842 ("[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . , and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious"). Accordingly, there is a question of fact whether Bennett, when talking to Plaintiff and seeing his symptoms, knew or should have known that Plaintiff suffered a serious medical need.

Next, the Court considers Bennett's response to Plaintiff's serious medical need. The record shows that on July 30, 3012, Bennett escorted a nurse to Plaintiff's cell, and the nurse checked Plaintiff's vitals, which were normal.  (Doc. 106, Ex. C, Bennett Decl. ¶ 13.)  Bennett avers that he observed nursing staff at Plaintiff's cell front twice during the relevant time frame; therefore, he believed that the sick inmates were being monitored and treated by medical staff.  (*Id.* ¶¶ 34–35.)  Defendants argue that Bennett had no reason to believe that Plaintiff was not receiving care or that the care he was receiving was grossly inadequate; therefore, Bennett could not have been deliberately indifferent to Plaintiff's medical needs.  (Doc. 108 at 12.)

Plaintiff specifically avers, however, that, when Bennett came to his and Montijo's cell on July 31, 2012, Montijo explained to Bennett that the nurses refused to help or examine them and that they needed to see a doctor for a diagnosis.  (Doc. 63, Pl. Decl. ¶ 95.)   Thus, contrary to Defendants' argument, Bennett had reason to believe that Plaintiff was not receiving care.   As Defendants acknowledge in their Motion for Summary Judgment, "non-medical personnel may rely on the medical opinions of healthcare professionals unless they have actual knowledge that prison doctors or staff are *not* treating a prisoner."  (Doc. 108 at 7.)  *See Caplinger v. CCA*, 999 F. Supp. 2d 1203, 1214 (D. Idaho 2014) (if "a reasonable person would likely determine [the medical treatment] to be inferior," the fact that an official is not medically trained will not shield that official from liability for deliberate indifference"); *see also McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (non-medical personnel may rely on medical opinions of health care professionals unless "they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner") (internal quotation marks omitted).

Defendants suggest that, regardless, Bennett could not have done anything more because he could not force a doctor to see Plaintiff or unlock Plaintiff's cell and drive him to the hospital.  (Doc. 108 at 19.)  But, according to Bennett's own testimony, he could have initiated an ICS to summon immediate medical attention to Plaintiff's cell— even if the line nurse refused to do anything.  (Doc. 106, Ex. H, Bennett Dep. 31:3–21, May 19, 2016.)  Or Bennett could have escorted Plaintiff to the medical unit.  (*Id.*, Ex. C, Bennett Decl. ¶ 26.)   At the very least, Bennett could have called a superior officer. Whether it was reasonable for Bennett not to take any of these actions on July 31, 2012, despite actual knowledge that nurses had refused to treat Plaintiff, turns on Plaintiff's observable symptoms.  If a jury believes Plaintiff's allegations that, by this time, his condition had progressed to the point that he was struggling and gasping for breath, unable to walk, unable to talk clearly or open his eyes, in agony, and barely able to move, it could reasonably conclude that Bennett's failure to take any further action exhibited

1   deliberate indifference.  *See Leer*, 844 F.2d at 633; *Hunt*, 865 F.2d at 200 (reversing
2   summary judgment for prison officials where the plaintiff specifically alleged that they
3   were aware of his bleeding gums, breaking teeth, and inability to eat properly, yet they
4   failed to take any action to relieve his pain); *see also Olson v. Bloomberg*, 339 F.3d 730,
5   738 (8th Cir. 2003) (an officer's conduct may be considered unreasonable even if the
6   officer took "some measures in response" to a high medical risk).

### 2.   Suarez

8   The record shows that Suarez interacted with Plaintiff on July, 30, 2012, and (Doc.
9   63, Pl. Decl. ¶ 53, 60; Doc. 106, Ex. G, Pl. Dep. 123:12–17.)  Suarez avers that he did not
10  observe Plaintiff struggling to breathe or exhibiting slurred speech or drooping eyelids.
11  (Doc. 106, Ex. D, Suarez Decl. ¶ 18.)  Suarez also avers that Plaintiff never complained
12  to him of blurred vision, difficulty swallowing, or muscle weakness; rather, Plaintiff
13  reported only generic, flu-like symptoms, and Plaintiff never claimed to Suarez that he
14  had botulism.  (*Id.* ¶¶ 19–20.)

15  As discussed, knowledge of a specific diagnosis is not required for a prison
16  official to be aware of a risk of serious harm.  And Defendants fail to submit a videotape
17  that was made on July 29, 2012, which could show Plaintiff's condition.  Also, according
18  to Plaintiff's allegations, by July 30, 2012, his symptoms were quite severe and
19  observable.  In his deposition, Plaintiff testified that on July 30, 2012, he was mumbling
20  his words and fighting for air while trying to talk to Suarez, and he told Suarez that he
21  and Montijo were really sick and needed help.  (Doc. 106, Ex. G, Pl. Dep. 123:18–
22  124:17.)  On this record, there is a question of fact whether Suarez knew or should have
23  known that Plaintiff had a serious medical need.

24  Defendants submit that, during the relevant time, Suarez was in Plaintiff's pod
25  three times.  (Doc. 108 at 12.)  Suarez testifies that during one of his visits, he collected
26  HNRs from the sick inmates and personally delivered them to medical to make sure they
27  did not get lost or misplaced.  (Doc. 106, Ex. I, Suarez Dep. 24:17–25:5, May 24, 2016.)
28  Suarez states that he personally contacted the medical unit about the sick inmates, and he

was advised that medical staff were aware of the inmates' complaints, that they had already been seen, or that medical staff would go to see them at their cell fronts during medication delivery.  (Doc. 106, Ex. D, Suarez Decl. ¶ 16.)  Suarez explained that on one occasion, he personally escorted a nurse to the pod after contacting the medical unit about Plaintiff and the other sick inmates' complaints; however, he did not listen in or witness an exam of Plaintiff at that time.  (*Id.*)

Plaintiff avers that Suarez came to his cell on July 30, 2012.  (Doc. 63, Pl. Decl. ¶¶ 53, 60.)  Plaintiff testifies that when he spoke to Suarez that day, Suarez said he would arrange a medical visit, and he called medical.  (*Id.* ¶ 63; Doc. 106, Ex. G, Pl. Dep. 124: 18–19.)  Plaintiff states that Suarez then returned to Plaintiff's cell and told him that medical said Plaintiff and his cellmate had already been treated and that no one at the medical unit wanted to see him.  (Doc. 106, Ex. G, Pl. Dep. 124:19–20; Doc. 63, Pl. Decl. ¶ 66.)

Notably, Plaintiff does not allege that he or Montijo informed Suarez that they had not, in fact, been treated, and that the nurses had refused to examine them or help them.  Absent that information, Suarez's reliance on the statements from the medical staff and belief that Plaintiff's medical needs were being addressed was reasonable.  *See Caplinger*, 999 F. Supp. 2d at 1214.  In these circumstances, where Suarez did not know about the lack of treatment, and he did not ignore Plaintiff or otherwise exhibit deliberate indifference to Plaintiff's circumstances, Suarez cannot be liable for an Eighth Amendment violation.  *See Caplinger*, 999 F. Supp. 2d at 1214; *see also King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (absent reasonable belief or knowledge that prison medical staff are mistreating or not treating a prisoner, nonmedical officers are entitled to defer to medical staff's judgment as long as the officers do not ignore the prisoner) (citations omitted).  Summary judgment will therefore be granted to Suarez, and he will be dismissed from the action.

### 3.    Swaney

Defendants submit that Swaney had contact with Plaintiff on July 26, August 1,

and August 2, 2012. (Doc. 108 at 13.) Swaney testifies that he had the opportunity to see Plaintiff and his cellmate and to talk to them. (Doc. 106, Ex. J, Swaney Dep. 24:7–17.) Plaintiff alleges that his serious symptoms were observable by July 26, 2012, and his symptoms escalated prior to his August 2, 2012 hospitalization. (Doc. 63, Pl. Decl. ¶¶ 17–22, 36, 39.) Thus, there is a question of fact whether Swaney knew or should have known that Plaintiff suffered a serious medical need.

The Court next considers Swaney's response to Plaintiff's medical need. In his deposition, Swaney testifies that on or around August 1, 2012, inmates were banging on their cell fronts and yelling, and once Swaney got everybody quieted down, he assessed the situation, and the inmates told him they were not feeling well. (Doc. 106, Ex. J, Swaney Dep. 62:1–2, 20–24; 64:23–65:3.) Swaney states that *after* he spoke to the sick inmates, he went to speak to medical staff, who told him that they already addressed the inmates' issues that morning and no further response was necessary. (*Id.* 62:25–63:10.) This statement appears to conflict, however, with other testimony from Swaney stating that he was not personally aware if Plaintiff had been seen by the medical staff prior to August 2, 2012—the date Plaintiff saw the doctor and went to the hospital. (*Id.* 62:1–10.) Then, in their Motion, Defendants assert that *before* Swaney spoke to the inmates that day, he confirmed with medical staff that the inmates had been seen and assessed. (Doc. 108 at 14.) But the materials cited in support of this assertion do not establish that Swaney spoke to medical on August 1, 2012, before he entered the pod and spoke to Plaintiff and Montijo. (*See id.*, citing Doc. 106 ¶¶ 64, 169, 172.) In short, Swaney's inconsistent statements create a question of fact as to whether he knew of and, thus, could have relied on, any medical determination when he interacted with Plaintiff prior to August 2, 2012.

Plaintiff's declaration statements also establish a question of fact on this issue. Plaintiff avers that when Swaney entered that pod, he looked at Plaintiff "wheezing for breath and shouted words to the effect, 'I can't do anything for you. Medical doesn't want to help you!'" (Doc. 63, Pl. Decl. ¶¶ 103–104.) Plaintiff avers that when Montijo

begged to speak to Swaney's supervisor or a doctor, Swaney yelled "no!"; shook a can of pepper spray at Plaintiff and Montijo and threatened to pepper spray them if they kept asking for medical help; and yelled at inmates in the pod to shut up and that "they don't have shit coming." (*Id.* ¶¶ 105–106, 110.)   Taking Plaintiff's facts as true, Swaney refused to get Plaintiff medical help *before* he allegedly went and spoke to medical staff; thus, contrary to his deposition testimony, he could not have been relying on any medical determination at the time he yelled at Plaintiff and threatened him with pepper spray.

Consequently, the record does not support that Swaney was aware of and relied on any medical decisions or ongoing treatment related to Plaintiff.  As mentioned, there was no diagnosis or medical assessment until Plaintiff finally saw a doctor on August 2, 2012, and Plaintiff alleges that the nurses refused to help him.  *Cf. Peralta*, 744 F.3d 1076, 1087 (prison official not liable for deliberate indifference where he signed off on a medical grievance appeal because he was not a dentist and he relied on two dentists who investigated the plaintiff's complaints).  Contrary to Defendants' argument, Swaney was not expected to drive Plaintiff to the hospital himself to avoid liability for deliberate indifference.  (*See* Doc. 108 at 19.)  Rather, the Eighth Amendment required him to take reasonable measures to abate a risk of serious harm to Plaintiff.  Based on Swaney's own averments, this could have included escorting Plaintiff to the medical unit or initiating an ICS, but he did neither.  (Doc. 106, Ex. E, Swaney Decl. ¶¶ 15–16.)  When viewing the facts in Plaintiff's favor, a reasonable jury could conclude that Swaney's August 1, 2012 response to Plaintiff's serious medical need—his refusal to get medical care, yelling obscenities, and threats to pepper spray Plaintiff if he asked for care again—was not reasonable and exhibited deliberate indifference.

With respect to the events on August 2, 2012, the Court must take Plaintiff's facts as true.  He alleges that Swaney came to his cell, said that unless one of the inmates confessed to using hooch, they could not see a doctor.  (Doc. 63, Pl Decl. ¶¶ 112–133.) Plaintiff indicated that he used hooch in order to see a doctor.  (*Id.* ¶¶ 114–116.)

1    In *Wesley v. Davis*, the prisoner plaintiff alleged that the defendants threatened to

2    withhold necessary medical treatment unless the plaintiff withdrew his grievance appeal.

3    333 F. Supp. 2d 888, 893–94 (C.D. Cal. 2004).  The District Court for the Central District

4    of California held that this "form[] of corruption amount[s] to [an] Eighth Amendment

5    violation, regardless of whether Plaintiff's [medical] condition demonstrably worsened"

6    as a result of the defendants' conduct.  *Id.* at 893.  The district court held that, taking as

7    true the plaintiff's allegations that the defendants threatened to withhold necessary

8    medical treatment in order to blackmail the plaintiff, "this sort of conduct would rise to

9    the level of cruel and unusual[,]" and "the conduct undoubtedly resulted in 'pain and

10   suffering which no one suggests would serve any penological purpose.'"  *Id.* at 893–94

11   (quoting *Estelle*, 429 U.S. at 103).

12   Following *Wesley*, the Court finds that there is a question of fact whether

13   Swaney's intentional conduct—threatening to withhold medical treatment absent a

14   confession to a disciplinary violation, despite knowing that Plaintiff suffered a serious

15   medical need—resulted in unnecessary and gratuitous suffering.  *See Wesley*, 333 F.

16   Supp. 2d at 893–94; *see also Estelle*, 429 U.S. at 103 (the Eighth Amendment "proscribes

17   more than physically barbarous punishments[,]" it "embodies 'broad and idealistic

18   concepts of dignity, civilized standards, humanity, and decency'") (internal quotation

19   omitted).  A reasonable jury could conclude that, in this instance, Swaney's conduct

20   offended the Eighth Amendment.

21   ### C.     Harm From the Indifference

22   Defendants contend that Plaintiff's claim against Bennett and Swaney fails

23   because Plaintiff cannot show that their actions caused him harm.  (Doc. 108 at 9.)

24   Defendants argue that they did not cause Plaintiff to get botulism, nor did they ignore

25   Plaintiff.  (*Id.* at 10.)  Defendants submit that each time they encountered Plaintiff, they

26   responded in some fashion.  (*Id.*)  They further argue that there is no evidence Plaintiff

27   was not receiving adequate medical care.  (*Id.*).  These arguments concern whether

28   Defendants acted with deliberate indifference to Plaintiff's serious medical need, not

whether Plaintiff suffered harm as a result, and the Court has already determined that material factual disputes exist on this issue.

Defendants next contend that because botulism is so rare and difficult to diagnose, it is pure speculation to conclude that Plaintiff would have recovered more quickly or avoided substantial pain had he gone to the hospital sooner. (*Id.*) Plaintiff responds that until he received treatment on August 2, 2012, he was in physical pain and suffered emotionally, and he even wrote a "farewell letter" to his family believing that he was going to die. (Doc. 121 at 14.) The reasonable inference can be made that had Plaintiff received treatment earlier, he would have received relief for his pain and suffering sooner and not believed that he was going to die without treatment.

Lastly, Defendants argue that without competent medical evidence establishing a breach of the standard of care for botulism and medical causation, Plaintiff cannot show that Defendants' actions harmed him. (Doc. 108 at 10–11.) This standard-of-care argument is of no moment because Defendants are not medical providers being sued for medical negligence, and, regardless, Plaintiff alleges that he received *no* medical care. *See* Ariz. Rev. Stat. § 12-563 (1)–(2) (evidence of the applicable standard of care and causation applies to state law medical negligence claims against health providers).

On this record, a reasonable jury could find the Defendants' actions resulted in a delay in treatment that caused Plaintiff to suffer unnecessary pain and harm sufficient to support an Eighth Amendment claim.

## VI.    Qualified Immunity

### A.    Applicable Standard

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). There are two prongs in the qualified-immunity inquiry: "(1) whether the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established as of the date of the involved events in light of the specific

context of the case." *Tarabochia v. Adkins*, 766 F.3d 1115, 1121 (9th Cir. 2014) (internal quotation omitted.)   In its analysis, the Court must view the facts "in the light most favorable to the injured party."   *Chappell v. Mandeville*, 706 F.3d 1052, 1058 (9th Cir. 2013) (citation omitted).

### B.   Discussion

The Court has already determined that there exist material factual disputes whether Bennett and Swaney acted with deliberate indifference to Plaintiff's serious medical need in violation of the Eighth Amendment.   Qualified immunity therefore turns on the second step of the analysis—whether Plaintiff's rights were clearly established such that a reasonable official would have known that the conduct alleged was unlawful.

In their second Motion for Summary Judgment, Defendants argue that Plaintiff does not have a clearly established right "to have the Defendants, who are all non-medical prison staff, override the medical directives of prison medical personnel—or more precisely, to require non-medical prison staff to make specific clinical decisions such as demanding that a doctor see an inmate who has already been seen and treated by medical staff." (Doc. 108 at 17.)  This is not the right at issue in this case.

In the Ninth Circuit, the deliberate indifference standard sufficiently particularizes the right at issue in Eighth Amendment medical care cases.  *See Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir. 1995) (explaining that the "Eighth Amendment rights in the prison medical context" have "already been particularized") (emphasis omitted); *accord Newell v. Sauser*, 79 F.3d 115, 117 & n.3 (9th Cir. 1996).  The Ninth Circuit has held that the Eighth Amendment's guarantee that prisoners have "a right to officials who are not 'deliberately indifferent to serious medical needs'" is clearly established.  *Kelly*, 60 F.3d at 667.  Thus, officers are not entitled to qualified immunity when they fail to provide medical assistance to an individual who has a serious medical need that was either obvious or reported to the officers.  *See Hamilton*, 981 F.2d at 1067; *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009); *see also Estate of Owensby v. City of Cincinnati*, 414 F.3d 596, 603–04 (6th Cir. 2005).  Moreover, the right to adequate

medical care encompasses the more specific right to adequate treatment in an emergency; "it is apparent that not just the right to medical care in general, but the specific right to be provided with adequate treatment in a medical emergency [is] indeed clearly established[.]" *Howarth v. Boundary Cnty.*, No. 2:14-cv-00312-REB, 2016 WL 5745101, at *12 (D. Idaho Sept. 30, 2016) (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (abrogated on other grounds), and *Provencio v. Vasquez*, 258 F.R.D. 626, 637 (E.D. Cal. 2009) (collecting cases and holding that the right to emergency medical treatment under the Eighth Amendment is clearly established for purposes of the qualified immunity inquiry)).

In its first Summary Judgment Order, the Court found that Plaintiff met his burden of proving that the right at issue is clearly established.  (Doc. 64 at 10.)  *See LSO, Ltd. v. Stroh*, 205 F.3d 1145, 1157 (9th Cir. 2000) (the plaintiff bears the burden of proving that the right allegedly violated was clearly established).  In mischaracterizing the right at issue, Defendants fail to show that the Court's prior determination on this prong was in error.  And to the extent that Defendants claim qualified immunity based on their version of disputed facts, qualified immunity is not proper.  (*See* Doc. 108 at 18–20.)  *See Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("[w]here the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate").

Construing the facts in Plaintiff's favor, Defendants refused to ensure medical attention for Plaintiff despite his serious symptoms and desperate pleas for medical care. Before 2012, it was clearly established that officers could not intentionally deny or delay access to medical care, and that failing to respond to a prisoner's pain or possible medical need exhibited deliberate indifference.  *Estelle*, 429 U.S. at 104; *Jett*, 439 F.3d at 1096. Accordingly, summary judgment based on qualified immunity is not appropriate.

**IT IS ORDERED that** Defendants' Motion for Summary Judgment (Doc. 108) is **granted in part** and **denied in part**.  The Motion is **granted** as to Defendant Suarez, and

he is dismissed as a Defendant; the Motion is **denied** as to Defendants Bennett and Swaney.

IT IS FURTHER ORDERED that a Joint Proposed Pretrial Order should be filed with the Court on or before **July 28, 2017**.

Dated this 26th day of June, 2017.

_____
Honorable David C. Bury
United States District Judge