1
2
3
4
5

WEEKS LAW FIRM PLLC
3839 E. Marshall Gulch Pl.
Tucson, AZ 85718
(520) 331-3669
weeks@weekslegal.com
Stephen M. Weeks, SBN 020726
Attorney for Plaintiff

6
7
8

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

9
10
11
12
13

Hector Lopez, an individual

          Plaintiff,

vs.

COII Bollweg et al.,

          Defendants.

**CASE NO. 4:13-CV-00691-DCB**

**RULE 59 MOTION FOR NEW TRIAL**
**(Hearing Requested)**

**HON. DAVID C. BURY**

14
15
16
17
18
19

      Pursuant to Rule 59, Federal Rules of Civil Procedure, Plaintiff, Hector Lopez, hereby moves for a new trial in the above captioned matter.

      For the reason more formally set forth in the following Memorandum of Points and Authorities, Plaintiff's Motion for New Trial should be granted.

20

**MEMORANDUM OF POINTS AND AUTHORITIES**

21
22

**I.    Procedural Background**

23
24
25
26

      This case was filed on July 22, 2013. On March 31, 2015, the Court denied the Motion to Dismiss claims against Defendants Bennett and Swaney (Doc. 64). In that order, the Court dismissed multiple defendants, but denied the motion to

dismiss as to Defendants Bennett, Suarez, Robinson, and Swaney. (Doc. 64 at P. 11).

The remaining Defendants filed a Motion for Summary Judgment on November 18, 2016. (Doc. 108). On June 26, 2017, the Court issued its Order. (Doc. 125). The order dismissed defendants' Robinson and Suarez. The Court held that fact questions precluded summary judgment in favor of defendants' Bennett and Swaney.

The Court pointed out that,

> "Knowledge of a specific diagnosis is not required for a prison official to be aware of a risk of serious harm. Moreover, the record shows that nurses could not make an assessment or diagnosis; thus, Plaintiff could not get any diagnosis until he saw a doctor, which he alleges Defendants prevented." (Doc 125 at 9:24-27)

The Court correctly held that,

> "Believing Plaintiff's allegations regarding his condition, a jury could find that Defendants knew of Plaintiff's serious medical need from the fact that it was obvious."

The Court noted that believing Mr. Lopez's evidence, Defendants had the ability to initiate an ICS even if the line nurses did not act. Likewise, the Defendants has an ability to call a superior. (Doc. 125 at 12 and 16). The Court further found that Defendant Swaney's intentional conduct, withholding medical

care absent a confession to a disciplinary violation (drinking "hooch") was also a fact question for the jury to decide. (Doc. 125 at 17:12-20).

## II.    Rule 50 Standard

Rule 50 provides that a court may grant judgment as a matter of law once a party has been fully heard on an issue and the court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue[.]" Fed. R. Civ. P. 50(a)(1). The Rule 50 standard mirrors the standard for granting summary judgment under Rule 56 - "the inquiry under each is the same." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In deciding a Rule 50 motion, "the court '**may not make credibility determinations or weigh the evidence**.'" *E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149-50 (2000)) (Emphasis Added). Rather, the court "must view the evidence in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in that party's favor." *Reeves*, 530 U.S. at 150. The test is whether, "under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson*, 477 U.S. at 250.

## III.    Rule 50 Hearing

This Court granted the Defendants' Rule 50 motion after the close of Plaintiff's case. The court stated,

- 3 -

"So even on the merits, I can't see where a reasonable jury would have sufficient - - a sufficient evidentiary basis to find, the way the law defines it, that they were deliberately indifferent. Could these folks have done better? Well, we can always do better. Were they indifferent? I don't really think they were. But even if they were indifferent, there is absolutely no evidence that they made a conscious choice to disregard the need for medical care.

"I think if the jury - - if this case went to a jury, it would be manifest injustice for them to find liability against these security officers." Hearing Transcript at 6:1-12. (Exhibit 1)

The Court explained its main reasoning as,

"We have the first witness in this case, a - - not a doctor, but a physician's assistant, and I thought he was quite knowledgeable and credible, who testified directly that: the nursing staff at this institution was very talented; they didn't perceive any emergency, and yet you expect security officers to see that and to respond it; that the disease is rare; that the disease is difficult to diagnose; that I think almost at all times the vital signs as presented by Mr. Lopez were in normal limits; that he was seen during this relevant period of time, between July 26 and August 2, six times." Hearing Transcript at 4:20-5:5.

## IV.    Facts Adduced at Trial

**Nick Salyer, P.A.** Mr. Salyer testified at trial that:

1. When he saw Mr. Lopez, he was concerned that the disease had progressed to the point where Mr. Lopez could die.

2. Botulism is a progressive disease if enough toxin is ingested.

3. Some open and obvious botulism symptoms a victim could experience included droopy eyes, facial paralysis, breathing difficulties, and difficulty moving extremities.

4. Mr. Lopez was not seen by someone authorized to diagnose and treat Mr. Lopez until Mr. Lopez was brought to see Mr. Salyer on August 2, 2012.

5. Mr. Salyer may have been able to diagnose Mr. Lopez by July 28, 2012 if Mr. Lopez had been brought in to see him.

**Gabriel Suarez.** Mr. Suarez testified at trial that:

1. He was concerned about Mr. Lopez, Mr. Montijo, and Mr. Aceves.

2. Mr. Suarez personally went to each inmate and picked up Health Needs Requests, in hopes of getting the inmates to someone able to diagnose and treat these three inmates.

3. Mr. Suarez was concerned that the inmates had a contagious disease that could spread to the community.

**Henry Bollweg.** Mr. Bollweg's deposition testimony was read into the record. Mr. Bollweg's testimony established that:

1. He called an ICS for Mr. Lopez because Mr. Lopez needed emergency assistance.

2. Part of a prison guard's duties include protecting the lives of the inmates.

3. Guards can initiate an ICS or contact a supervisor to obtain medical care if the nurses are not responding to an inmate's complaints.

4. That ICS's are typically videotaped.

**Hector Lopez.** Mr. Lopez testified that:

1. His symptoms were open and obvious, including droopy eyes, facial paralysis, breathing difficulties, and he had difficulty moving his arms and legs.

2. He was videotaped during Mr. Bollweg's ICS.

3. Mr. Bennett and Mr. Swaney were told the nursing staff were not treating Mr. Lopez.

4. Mr. Bennett and Mr. Swaney did not initiate an ICS nor attempt to obtain medical treatment after hearing that Mr. Lopez was not being treated.

5. Mr. Swaney threatened to pepper spray Mr. Lopez if Mr. Lopez continued asking for medical treatment.

6. Before seeing Mr. Salyer, Mr. Lopez was required to confess to drinking hooch.

**Mr. Bennett.** Mr. Bennett testified that:

1. He did not initiate an ICS.

2. He did not seek out a supervisor.

3. According to ADC records there was a video camera present during the ICS called for Mr. Lopez.

4. Sergeants had access to the videotaped footage.

**Mr. Swaney.** Mr. Swaney testified that:

1. He did not initiate an ICS.

2. He was a sergeant.

3. Sergeants had access to the videotaped footage of Mr. Lopez's ICS.

4. He was ordered by the Deputy Warden to arrange for Mr. Lopez to go to the medical unit.

5. He was ordered to obtain a confession from Mr. Lopez that Mr. Lopez drank hooch so that Mr. Lopez could be charged the cost of medical treatment.

**Documentary Facts.** The guards were required to follow Arizona Department of Corrections ("ADOC") rules and regulations. These rules were admitted into evidence: DO 807.08 "Intervention", which provides in subsection 1.1:

> **<u>All staff</u> shall assess and render aid to ALL medical emergencies**, including suicide attempts, as soon as possible or within no longer than 3 min. of becoming aware of a non-responsive inmate or **an inmate in medical crisis**. (Emphasis added).

Furthermore, subsection 1.3 provides in relevant part:

"In the event that an inmate is found . . . in a state of medical emergency . . . staff shall assess the situation and shall render in-cell aid as soon as possible or within no longer than three minutes of becoming aware of the situation."

DO 1100 provided in relevant part:

"Health care shall be delivered through a joint effort of Inmate Health Services **and security operations**."

Additionally, it was undisputed that the ICS videotape Mr. Swaney had access to disappeared.

## V.    Legal Argument

In a case like this, a plaintiff must prove that the defendants were 1) deliberately indifferent 2) to a serious medical need 3) that harmed the plaintiff.  If such evidence exists, then the defendants can be held responsible under 42 U.S.C. §1983.

There is both an objective, and a subjective, prong to the 8th Amendment violation analysis:

"To violate the Eighth Amendment, the deprivation alleged must objectively be sufficiently serious; and the prison official must subjectively have a sufficiently culpable state of mind." *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043 (Fed. 9th Cir., 2002), citing *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

The first prong is objective: "did the inmate have a sufficiently serious

medical condition?" The second prong is subjective: "was the defendant deliberately indifferent?"

## 1. The Defendants Admit Plaintiff Suffered from a Sufficiently Serious Medical Condition.

It is undisputed that Mr. Lopez was suffering from a sufficiently serious medical condition. Mr. Lopez contracted botulism, a potent, life-threatening toxin. The defendants wrote in their 2016 Motion for Summary Judgment,

> "Defendants do not dispute that contracting botulism creates a serious medical need . . ." *Motion for Summary Judgment* at page 7, lines 22-23. (Doc. 105).

Accordingly, there is no further need to analyze the objective prong.

## 2. There is Admissible Evidence that the Defendants had a Sufficiently Culpable State of Mind.

A prison official has a sufficiently culpable state of mind if they are deliberately indifferent to a serious medical need. A sufficiently culpable mind exists when a Defendant denies or delays access to medical treatment.

### i. A Final Botulism Diagnosis is Unnecessary to Establish Deliberate Indifference

One of the Court's reasons for granting the Rule 50 motion was that Botulism is a difficult to diagnose condition. This is not the standard. The question is, were the symptoms open and obvious, or did the guards know (or have reason to know) that Mr. Lopez was not being treated for an objectively serious medical

condition. Mr. Lopez provided evidence that his symptoms were open and obvious. The Defendants denied Mr. Lopez's evidence. That created a fact question for the jury to decide since the inferences must be weighed in Mr. Lopez's favor.

What is more, its long established that non treatment for a potentially communicable disease – what Mr. Bennett and Mr. Suarez testified existed, is more than sufficient to mandate actual medical treatment, even without symptoms.

> "We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery. Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms."

*Helling v. Kinney*, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) at 33.

> "Indifference 'may appear when prison officials deny, delay or intentionally interfere with medical treatment, . . .'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir., 2006), citing *Hutchinson v. United States*, 838 F.2d 390, 392 (9th Cir. 1988). See also: *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

The Court is required to apply the same standard in determining a Rule 50 Motion as in determining a Motion for Summary Judgment. Here, the evidence, taken together, must be determined in favor of the non-moving party, Mr. Lopez.

> "We must view the evidence in the light most favorable to the non-moving party, and then ask whether there is any "genuine dispute as to any material fact" under the

governing substantive law." *Hamby v. Hammond*, 821 F.3d 1085, 1090 (9th Cir., 2016).

The Court is not permitted to weigh the evidence and decide as a matter of law that Mr. Lopez's testimony, and other related evidence, about his symptoms being open and obvious was insufficiently credible. With that standard in mind, there was more than enough evidence for the jury to weigh and determine what evidence was more credible, Plaintiff's or Defendants'.

### ii. No One Provided Medical Treatment Until August 2, 2012.

It was also undisputed at trial that Mr. Lopez was not diagnosed or treated until August 2, 2012. The taking of vitals is a cursory care. It does not diagnose any disease. It does not provide any treatment. Cursory care is equivalent to no treatment at all.

> "Deliberate indifference can also occur where the care given is so cursory as to amount to no treatment at all. See *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985)." *Parzyck v. Prison Health Services, Inc.*, No. 07-14715 (11th Cir. 8/21/2008) (11th Cir., 2008)

Not a single piece of evidence suggested that Mr. Lopez was diagnosed or treated for any illness before August 2, 2012. The simple truth is, the Defendants did not rely on any medical opinion, since **it is undisputed there was no medical opinion reached until the afternoon of August 2, 2012**.

This violates the constitution. See e.g. *Iko v. Shreve*, 535 F.3d 25, 242–43

(4th Cir. 2008) (failing to get a collapsed, pepper sprayed inmate medical attention even though a nurse was present does not permit a qualified immunity claim).

In deciding the Rule 50 Motion, the Court must look to whether admissible evidence existed that contradicted the defendants' story. If so, it creates a fact issue for the jury to decide.

> "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, cf. Hall 118 (cautioning against "confusing a mental state with the proof of its existence"), and **a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious**." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). (Emphasis added).

In other words, the deliberate indifference analysis does not turn solely on the individual correctional officer's testimony. Normal evidentiary standards apply, including proof through circumstantial evidence, that the defendants knew, or had reason to know, that Mr. Lopez was not being treated.

This case would be different if Mr. Lopez had seen PA Salyer, and the illness was misdiagnosed (i.e. diagnosing Mr. Lopez with a cold or the flu) and the correctional officers relied on Mr. Salyer's expertise. But they did not rely on anyone's expertise.

Under the Defendants theory of the case, the mere existence of "med pass" nurses essentially eliminates any duty under the ADC rules and regulations and the

duties imposed by the Constitution – even when no treatment is provided.

## A. The Missing Videotape was under Sgt. Swaney's Control and Disappeared.

It was undisputed at trial that a videotape existed. It was undisputed at trial that the videotape disappeared. The videotaped ICS was good evidence to show the nature and extent of Mr. Lopez's condition. This court noted in its Ruling on the Motion for Summary Judgment that a spoliation order might be warranted. This Court later ruled that it would not permit a spoliation instruction – but allowed Mr. Lopez to build a case for the instruction. To establish the viability of the instruction, Mr. Lopez needed to prove that a videotape existed. That evidence was admitted and uncontested at trial. The next step was establishing that one or both defendants had access, and the ability, to destroy the videotape. That evidence was established when Mr. Suarez, Mr. Bennett, and Mr. Swaney all admitted that a sergeant had such access to the videotape.

The videotape would have shown Mr. Lopez's condition, and established as a fact, that his symptoms were open and obvious on July 28, 2012. Giving a state defendant with access, opportunity, and motive to destroy substantial evidence will only encourage further correctional officers to do the same. After establishing the above facts, this Court should have considered this before entering a Rule 50 Judgment in the Defendants' behalf.

**VI.   Conclusion**

There is no evidence that either Defendant relied on any medical expert. None. Taking vitals is not treatment. Taking vitals is not diagnosing. Mr. Lopez was denied access to see the **<u>only</u>** health care provider authorized to diagnose and put together a treatment plan. Instead, these officers were content to let Mr. Lopez suffer in his cell. The defendants acted with deliberate indifference to a serious medical need.  The Defendants did not rely on any sort of medical diagnosis, they simply chose to ignore the complaints from three separate inmates all suffering from botulism toxin.  The Defendants had duties, both under the Constitution, and according to ADC's own policies to protect those in their charge, including Mr. Lopez. Their decision to ignore the serious medical condition, having actual knowledge that Mr. Lopez was not being treated and had not seen a doctor, is sufficient for to warrant a new trial.

Accordingly, the Court should order a new trial for Mr. Lopez.

DATED this  12<u>th</u>  day of <u>March</u>, 2020.

WEEKS LAW FIRM PLLC

s/Stephen M. Weeks
Stephen M. Weeks, Esq.
Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on the __12th__ day of March, 2020, I electronically filed the foregoing Document with the United States District Court using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

Claudia Acosta Collings, Esq.
Paul Carter, Esq.
Assistant Attorney General
416 W. Congress Ave., 2nd Floor
Tucson, AZ 85701-1315
Attorney for Defendants

1

Exhibit 1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF ARIZONA |

| 3 | Hector Lopez, an individual, | CV-13-691-TUC-DCB |
| 4 | Plaintiff, |
| 5 | vs. |
| 6 | Charles Ryan, et al., | February 12, 2020 |
| | | 10:48 a.m. |
| 7 | Defendants. | Tucson, Arizona |

| 8 | |
| 9 | PARTIAL TRANSCRIPT OF PROCEEDINGS |
| 10 | BEFORE THE HONORABLE DAVID C. BURY |
| | UNITED STATES DISTRICT JUDGE |
| 11 | |
| 12 | A P P E A R A N C E S |

13 For the Plaintiff:

14     Stephen M. Weeks
    Weeks Law Firm, PLLC
15     P.O. Box 126
    Marana, Arizona 85653

16

17 For the Defendants:

18     Claudio Acosta Collings
    Paul E. Carter
19     Office of the Attorney General
    416 West Congress
20     Second Floor
    Tucson, Arizona 85701

21

22 Court Reporter:     Erica R. McQuillen, RDR, CRR
    Official Court Reporter
23     405 W. Congress Street
    Tucson, Arizona 85701
24     (520)205-4267

25     Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared by Computer-Aided Transcription

1            P R O C E E D I N G S

2            THE COURT:  All right.  Counsel, have a seat.

3            All right.  Mr. Carter, you have a motion at the

4   conclusion of plaintiff's case, the plaintiff having had an

5   opportunity to be fully heard on the allegations of his

6   complaint.

7            MR. CARTER:  Thank you, Your Honor.

8            This case sure has had a tortured path to get to

9   trial, and obviously qualified immunity has been a big issue,

10  and --

11           THE COURT:  Well, you know, I know that's one basis

12  for your motion.

13           MR. CARTER:  Would you rather hear about --

14           THE COURT:  Do you have a motion that there is not

15  sufficient evidence to submit to the jury on the merits of the

16  plaintiff's claim?

17           MR. CARTER:  Right.  That's based largely on our

18  trial memo, just the fact that he has missed material elements

19  of his cause of action.

20           THE COURT:  So your motion is two-prong then.  There

21  are two prongs to the qualified immunity.  One of them is

22  whether the law was clearly established at the time of the

23  action that it would have been clear to a reasonable officer

24  that his conduct was unlawful, and my concern in the case was

25  the plaintiff was being seen affirmatively by medical

1    professionals at the time of the alleged conduct.

2              I fail to see where the officer's conduct would be

3    unlawful if the plaintiff is already being treated by

4    competent medical.

5              MR. CARTER:  Well, that's a big part of our

6    argument, Your Honor, because there's been no evidence that

7    the medical staff fell below their standard of care, so if you

8    cannot be deliberately indifferent by being negligent or even

9    grossly negligent, it would follow that, if you believe the

10   nurses are doing their job, you're not going to be

11   deliberately indifferent.  If you believe they're being

12   negligent, you're not being deliberately indifferent.  And

13   even if you think they might have dropped the ball once, at

14   most that's negligence, and that's not breach of a

15   constitutional right.

16             THE COURT:  That would be an objectively reasonable

17   mistake, it appears to me.  This is a disease that, A, is

18   rare, and B, is difficult is diagnosis, and C, there was at

19   least the allegation of the inmates using hooch that would

20   make them sick.

21             Well, the reason I'm cutting you short is I am

22   inclined to grant a motion in this case, and so I want to make

23   sure that I've given Mr. Weeks the opportunity to be heard, so

24   you've said enough.

25             MR. CARTER:  Thank you, Your Honor.

1          THE COURT:  And Mr. Weeks, in terms of the

2    substantive allegations here, you have to prove and a

3    reasonable jury would have to conclude that there was

4    deliberate indifference to the need for medical treatment, and

5    that's defined as the defendant knew of that medical need and

6    disregarded it by failing to take reasonable measures to

7    address it, and deliberate indifference is defined as a

8    conscious choice to disregard the consequences of one's acts

9    or omissions.

10          I can't really find any evidence in this case that

11   there was any indifference, much less a deliberate

12   indifference, to address medical need when there was the

13   available and the active intervention by medical personnel

14   between July 26 and August 2.

15          You would almost be requiring these officers to

16   overrule the health care providers at the institution and say,

17   no, no, no, they really are suffering from a serious

18   difficult-to-diagnosis disease, they really are, and I'm going

19   to take them to the hospital anyway.

20          We have the first witness in this case, a -- not a

21   doctor, but a physician's assistant, and I thought he was

22   quite knowledgeable and credible, who testified directly

23   that: the nursing staff at this institution was very talented;

24   they didn't perceive any emergency, and yet you expect

25   security officers to see that and to respond it; that the

disease is rare; that the disease is difficult to diagnose;
that I think almost at all times the vital signs as presented
by Mr. Lopez were in normal limits; that he was seen during
this relevant period of time, between July 26 and August 2,
six times.  I thought it was five, but the witness said six
times.  I think that was maybe because it was a couple of
visits on August 2nd, wasn't it?  In any event, that's what he
said.

He also said the nurses did everything they should
have done, the officers did everything they should have done,
and had Mr. Lopez been sent to the hospital, because of the
nature of this disease and the difficulty in diagnosing this
disease, that probably the hospital would have sent him back.

There was some talk by Mr. Salyer that, in other
words, that this doctor wouldn't even have identified this
disease, because of its symptoms and the way they wax and
wane, that he, Salyer, was the guy that actually got him the
necessary medical care.

And you expect security officers to do more than
these health care providers.  I mean, Mr. Lopez was sick.
There's no question about that.  And in hindsight, he was very
sick and had a disease that could have killed him.  But nobody
knew that.  The nurses didn't know that.  A physician's
assistant didn't really know that until he was sent to the
hospital.

1          So even on the merits, I can't see where a

2    reasonable jury would have sufficient -- a sufficient

3    evidentiary basis to find, the way the law defines it, that

4    they were deliberately indifferent.  Could these folks have

5    done better?  Well, we can always do better.  Were they

6    indifferent?  I don't really think they were.  But even if

7    they were indifferent, there is absolutely no evidence that

8    they made a conscious choice to disregard the need for medical

9    care.

10          I think if the jury -- if this case went to a jury,

11   it would be manifest injustice for them to find liability

12   against these security officers.  So I'm looking for any basis

13   that you can give me, Mr. Weeks, in the evidence that would

14   support a verdict in this case on the merits, and even if you

15   -- and even if you do that, I'm inclined to dismiss the case

16   on the basis of qualified immunity.

17          So I'm required by the rule before I grant such a

18   motion to make sure that you're fully heard.  If there's

19   anything you can offer me to change my mind, now's the time to

20   do it.

21          And I might add, qualified immunity can be found at

22   any time during the proceedings, and had I looked at the case

23   the way I started looking at it when Salyer testified, and for

24   whatever reason I didn't, we wouldn't even have started this

25   trial.  And I think the difference is, either it wasn't argued

1    or I did not consider well enough that it was a kind of an

2    esoteric disease and that it would be difficult to diagnose,

3    and I also saw some evidence that maybe some security officer

4    denied any medical care to Mr. Lopez unless he admitted to

5    certain things, et cetera. I just thought I'd wind up trying

6    this case and having a jury answer a question that would

7    pertain to qualified immunity.

8         But I don't -- as sick as Mr. Lopez was, and maybe

9    there's a problem with the medical personnel, but that's not

10    before me. Two security officers are before me, two security

11    officers who are supposed to have deliberately been

12    indifferent to Mr. Lopez's medical needs. I can't find that.

13         MR. WEEKS: Your Honor, to address that, a guard is

14    deliberately indifferent if they know or should know that an

15    inmate is in need of medical care and not receiving it from

16    the health care providers.

17         THE COURT: Okay. They did get -- he did get

18    medical care.

19         MR. WEEKS: No, it's got to be treatment, medical

20    treatment, and treatment --

21         THE COURT: Well, they decide what medical treatment

22    to give? I thought that's why they had a medical clinic. So

23    a nurse or a PA or somebody that's got some expertise would

24    decide whether or not Mr. Lopez needed treatment, not the --

25    it would be like -- I mean, deliberate difference to me is, if

1  you want to exaggerate it on this continuum of potential

2  facts, there is an inmate in the showers that's been shanked,

3  and he's bleeding out on the floor of the shower.  Nobody else

4  is in there, and the officer sees him, says, well, he got what

5  he deserved, and he walks away.  That's a gross case.

6          You know, somebody that has a cough and other

7  symptoms of flu or illness.  Their vital signs are normal.

8  They take them to the health clinic, and the health clinic

9  doesn't send him to a hospital.  They don't send him to a

10  doctor.  And these guys are supposed to do that?

11          MR. WEEKS:  The undisputed testimony is that the

12  nurses were not qualified to make that determination, Your

13  Honor.

14          THE COURT:  Well, that's not their fault.

15          MR. WEEKS:  Well, but if they know or had reason to

16  know that --

17          THE COURT:  They're going to conclude that these

18  nurses are incompetent, they don't know what they're doing,

19  because this guy is really sick, and I need to get him to a

20  hospital, so whatever you nurses say, I don't agree with you,

21  I'm going to put him in a van and take him to the hospital.

22          That's just not what the law requires of them.

23          MR. WEEKS:  Well, they did have to get him to a

24  doctor, somebody who was qualified to assess and treat, and

25  since they did not do that, I say that that is deliberate

1  indifference under the law as previously cited.

2          THE COURT:  Well, that's what I thought you were

3  saying, but I don't agree with you.

4          MR. WEEKS:  I understand, Your Honor.  I understand.

5          THE COURT:  I'm also not being deliberately

6  indifferent to your medical issue.

7          MR. WEEKS:  Thank you, Your Honor.

8          THE COURT:  I plan to get you to a doctor, because

9  what I'm going to find, now that the plaintiff has been fully

10 heard on the issues, that the defendants are entitled to

11 judgment as a matter of law dismissing the complaint against

12 them, and this case will be dismissed.

13          All right?

14         MR. WEEKS:  Thank you, Your Honor.

15         MS. COLLINGS:  Thank you.

16         THE COURT:  When this jury gets in the jury room,

17 I'll tell them.  I'll go in there and tell them what I did,

18 it's all my fault, and send them home.

19          Anything else?

20         MR. WEEKS:  No, Your Honor.

21         MR. CARTER:  No, thank you, Your Honor.

22         MS. COLLINGS:  Thank you, Your Honor.

23          (Proceedings conclude at 11:03 a.m.)

24

25

1                    C E R T I F I C A T E

2

3          I, Erica R. McQuillen, Federal Official Realtime

4   Reporter, in and for the United States District Court for the

5   District of Arizona, do hereby certify that, pursuant to

6   Section 753, Title 28, United States Code, the foregoing is a

7   true and correct transcript of the stenographically reported

8   proceedings held in the above-entitled matter and that the

9   transcript page format is in conformance with the regulations

10  of the Judicial Conference of the United States.

11          Dated this 19th day of February, 2020.

12

13                          s/Erica R. McQuillen
                        Erica R. McQuillen, RDR, CRR
14                      Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25